**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

LAMAR MEDLEY, et al.,

        Plaintiffs,

    v.

ATLANTIC EXPOSITION SERVICES,
INC., et al.,

        Defendants.

No. 1:20-cv-15847-NLH-KMW

**OPINION**

**APPEARANCES**:

TIMOTHY CHRISTOPHER ALEXANDER
HELMER, CONLEY & KASSELMAN, P.A.
111 WHITEHORSE PIKE
HADDON HEIGHTS, NJ 08035

    *On behalf of Plaintiffs*.

EMILY J. DAHER
BALLARD SPAHR LLP
700 EAST GATE DRIVE
SUITE 330
MOUNT LAUREL, NJ 08054-0015

STEVEN W. SUFLAS
BALLARD SPAHR LLP
ONE UTAH CENTER
Suite 800
201 SOUTH MAIN STREET
SALT LAKE CITY, UT 84111-2221

    *On behalf of Defendant Atlantic Exposition Services, Inc.*

DAVID F. WATKINS, JR
KEVIN DOUGLAS JARVIS
O'BRIEN, BELLAND & BUSHINSKY, LLC
509 S. LENOLA ROAD, BUILDING 6
MOORESTOWN, NJ 08057

*On behalf of Defendant International Union of Painters, and Allied Trades AFL-CIO CLC District Council 711, a union and labor organization.*

JUDITH SZNYTER
JENNINGS SIGMOND
1835 MARKET STREET
SUITE 2800
PHILADELPHIA, PA 19103

*On behalf of Defendant International Union of Painters and Allied Trades, Industry Pension Plan, as trustee of an E.R.I.S.A Pension Plan.*

**HILLMAN**, **District Judge**

This matter comes before the Court on motions to dismiss filed by Defendants Atlantic Exposition Services, Inc., International Union of Painters, and Allied Trades AFL-CIO CLC District Council 711 ("the Union"), and International Union of Painters and Allied Trades, Industry Pension Plan, as trustee of an E.R.I.S.A Pension Plan ("the Pension Fund").  In this action, Plaintiffs, a group of union laborers, allege that Defendants, their employer, their union, and a union pension fund, committed a series of violations of the Labor Management Relations Act, state common law, and the New Jersey Law Against Discrimination.

Presently pending are Defendants' three motions to dismiss, as well as a motion to seal filed by Plaintiffs.  For the reasons expressed below, Plaintiffs' motion to seal will be granted, Atlantic and the Union's motions to dismiss will be

granted as to certain claims outlined herein, the Pension Fund's motion to dismiss will be denied as moot, and Plaintiffs' remaining state law claims will be remanded to state court.

## BACKGROUND

Plaintiffs Jose Luis Carreon, Luis Estrada, Charles Greenidge,[1] Rafael Flores, Matthew Chalakee, David Rolls, Lamar Medley, and Marlon Gibbs are a group of laborers who were previously employed by Atlantic Exposition Services and members of the Union.  Plaintiffs primarily worked as warehouse employees for Atlantic, and each began working for the company on or before July 2013.

Plaintiffs each identify as either African American, Latino American, or Native American; in fact, with the exception of the Warehouse Foreman, who was white, Plaintiffs allege that all of Atlantic's warehouse employees were African American, Latino American, or Native American.

As union laborers, Plaintiffs' employment was governed by a collective bargaining agreement entered into by the Union on their behalf and Atlantic, which is titled the "Trade

---

[1] Plaintiffs have spelled the last name of Charles "Greenidge" differently throughout their Complaint.  In the caption, and on the first page of the Complaint, his last name is spelled "Greenidge."  Periodically throughout the rest of the Complaint, however, his last name is spelled "Greenage."  For the purposes of this Opinion, The Court will refer to the plaintiff by the spelling of his name found in the caption of this case.

Show/Decorator Warehouse Agreement" (the "Warehouse Agreement"
or "CBA").  The CBA provides terms governing Plaintiffs'
employment, wages, benefits, and the process by which they
should pursue any grievances.

At some point prior to September 5, 2018, Plaintiffs
noticed a series of issues related to their wages, pensions, and
benefits.  Specifically, Plaintiffs discovered that (1) Atlantic
had been deducting "three (3) to five (5) percent of Plaintiffs'
gross pay from each paycheck due from the inception of their
work with Atlantic Exposition" for either union dues or as a
"check off" fee for the Union, (2) health insurance was not made
available to them by Atlantic, (3) no pension or retirement
benefits, vacation fund, or other benefits were made available
to them by Atlantic, (4) pay for overtime was either
miscalculated or withheld, (5) "monies for retroactive pay or
increases in salary" were also withheld by Atlantic, and (6) the
Union had withheld vacation funds that had been requested.
Plaintiffs allege that unlike them, the one white warehouse
employee, the Warehouse Foreman, has received the full benefit
of his hours towards Pension and Annuity benefits.

Concerned about these issues, Plaintiffs wrote a letter on
September 5, 2018 to Atlantic, the Union, and Defendant
International Union of Painters and Allied Trades, Industry
Pension Plan, (the "Pension Fund"), an employee benefit plan as

4

defined under the Employment Retirement Income and Security Act
of 1974 ("ERISA").  The letter raised some or all of the issues
mentioned above, and further requested an accounting of the
hours worked by each employee and the category of work that was
done.  Neither Atlantic nor the Union ever responded to the
September 2018 letter.  Plaintiffs did receive a response from
the Pension Fund, which stated that Plaintiffs' CBA did not
provide for contributions to the Pension Fund on their behalf or
for contributions to any other ERISA benefit plan.

Several months later, on January 25, 2019, Plaintiffs
Greenidge, Chalakee, Estrada, and Medley attempted to attend a
Union meeting, hoping to discuss the possibility of negotiating
a new CBA with their fellow Union members.  The four Plaintiffs
were ejected from the meeting however, and told it was because
their union dues were not current; Plaintiffs assert that they
were aware that the true reason for their being denied access to
the meeting was their previous attempt to raise the issues
mentioned above to a Union lawyer.

This was not the first time something like this had
happened, as Plaintiff Greenidge had previously been denied
access to a separate Union meeting on January 2, 2018.  At some
point prior to this incident, Plaintiffs appear to have retained
counsel, and through their counsel they sent a second letter to
Defendants on March 18, 2019, demanding to know why they were

being denied the opportunity to provide input on a new CBA

negotiation.  No response to this letter was ever received.

While Plaintiffs allege that they all have requested that

Atlantic or the Union address their concerns, only certain of

the Plaintiffs have attempted to address these issues through

official means.  Despite the clear grievance process provided

for in the CBA, Plaintiffs concede that only Medley, Greenidge,

and Estrada have filed grievances with the Union, and only state

that those grievances were related to the pension issues

described above, rather than the rest of their concerns.

Greenidge, however, went one step further: on April 27, 2018, he

filed an unfair labor practices charge with the National Labor

Relations Board, alleging that the Union had "failed and refused

to process the grievance of Charles Greenidge regarding the

employer's failure to pay his pension, annuity, vacation, and

health benefits for reasons that are arbitrary, discriminatory,

or otherwise in bad faith."  (ECF No. 09-4, Ex. A).

Finally, on March 14, 2020, Plaintiffs were each terminated

by Atlantic.  Six months later, on September 14, 2020,

Plaintiffs filed their Complaint in New Jersey Superior Court,

which the Union properly removed to this Court on November 11,

2020.  (ECF No. 1).  All three defendants then proceeded to

submit motions to dismiss the claims against them.  (ECF No. 9,

12, and 18).  Plaintiffs filed a joint brief in opposition to

the three motions, (ECF No. 24), which Defendants followed with briefs in further support of their motions shortly after.  (ECF No. 27, 28, and 29).

A few months later, Plaintiffs filed a motion to seal a document that was attached to the initial Complaint filed in state court and then attached along with Defendants' removal papers on this docket, which they stated was accidentally attached in lieu of the CBA Plaintiffs meant to file as their central exhibit.  That motion is unopposed, and the time to file an opposition to it has since passed.  The four pending motions are therefore ripe for adjudication.

## DISCUSSION

### I.   Subject Matter Jurisdiction

This Court has jurisdiction over Plaintiff's claims under 28 U.S.C. § 1331.

### II.  Standard for Motions to Dismiss

When considering a motion to dismiss a complaint for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6), a court must accept all well-pleaded allegations in the complaint as true and view them in the light most favorable to the plaintiff. Evancho v. Fisher, 423 F.3d 347, 351 (3d Cir. 2005).  It is well settled that a pleading is sufficient if it contains "a short

and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do . . . ." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (alteration in original) (citations omitted) (first citing Conley v. Gibson, 355 U.S. 41, 47 (1957); Sanjuan v. Am. Bd. of Psychiatry & Neurology, Inc., 40 F.3d 247, 251 (7th Cir. 1994); and then citing Papasan v. Allain, 478 U.S. 265, 286 (1986)).

To determine the sufficiency of a complaint, a court must take three steps: (1) the court must take note of the elements a plaintiff must plead to state a claim; (2) the court should identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth; and (3) when there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief. Malleus v. George, 641 F.3d 560, 563 (3d Cir. 2011) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 664, 675, 679 (2009) (alterations, quotations, and other citations omitted).

A district court, in weighing a motion to dismiss, asks "not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claim." Twombly, 550 U.S. at 563 n.8 (quoting Scheuer v. Rhoades, 416 U.S. 232, 236 (1974)); see also Iqbal, 556 U.S. at 684 ("Our decision in Twombly expounded the pleading standard for 'all civil actions' . . . ."); Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009) ("Iqbal . . . provides the final nail in the coffin for the 'no set of facts' standard that applied to federal complaints before Twombly."). "A motion to dismiss should be granted if the plaintiff is unable to plead 'enough facts to state a claim to relief that is plausible on its face.'" Malleus, 641 F.3d at 563 (quoting Twombly, 550 U.S. at 570).

A court in reviewing a Rule 12(b)(6) motion must only consider the facts alleged in the pleadings, the documents attached thereto as exhibits, and matters of judicial notice. S. Cross Overseas Agencies, Inc. v. Kwong Shipping Grp. Ltd., 181 F.3d 410, 426 (3d Cir. 1999). A court may consider, however, "an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document." Pension Benefit Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993). If any other matters outside the pleadings are presented

to the court, and the court does not exclude those matters, a
Rule 12(b)(6) motion will be treated as a summary judgment
motion pursuant to Rule 56.  Fed. R. Civ. P. 12(b).

## III. <u>Analysis</u>

Plaintiffs' Complaint asserts four causes of action, which
include a series of hybrid claims under § 301 of the Labor
Relations Management Action against both Atlantic and the Union,
a claim for unjust enrichment against Atlantic, claims of
discrimination in violation of the New Jersey Law Against
Discrimination ("NJLAD") against both Atlantic and the Union,
and finally a claim for failure to account against the Pension
Fund, seeking an order directing it to provide them an
accounting of the contributions made by Atlantic to the
Plaintiffs' pensions.  Defendants have moved to dismiss all four
claims.  The Court will address the claims in the order they
appear in the Complaint.

A. <u>Hybrid 301/Breach of C.B.A. Claim</u>

Count I of the Complaint asserts a hybrid § 301 claim
against both Atlantic and the Union.  "Such a claim is called
'hybrid' because the employee alleges under Section 301 of the
Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185, that
the employer breached the CBA, and also alleges that that the
Union breached its duty of fair representation ("DFR") by
failing to press the employee's grievance."  <u>Luongo v. Village</u>

Supermarket, Inc., 261 F. Supp. 3d 520, 526 (D.N.J. 2017)

(citing Jimenez v. GCA Servs. Grp., Inc., No. CV 16-1871, 2016

WL 6877738, at *2 (D.N.J. Nov. 21, 2016)).  Specifically,

Plaintiffs here allege that Atlantic "breached its Collective

Bargaining Agreements with plaintiffs by neglecting, failing,

and/or refusing to pay wages, overtime, and benefits earned by

the plaintiffs," and that despite Plaintiffs having requested

the Union's representation in grievances associated with these

issues, the Union has failed to provide fair representation.

(ECF No. 1-1 at ¶¶ 2-7).

Judge Walls helpfully summarized the requirements for

stating a valid hybrid claim for breach of both a CBA and a

union's duty of fair representation in Pagano v. Bell Atlantic-

New Jersey, Inc.:

> The two claims ... are inextricably linked. "To
> prevail against either the company or the Union,
> ... [employee-plaintiffs] must not only show that
> their discharge was contrary to contract but also
> carry the burden of demonstrating a breach of duty
> by the Union." DelCostello v. International Bhd. of
> Teamsters, 462 U.S. 151, 165, 103 S.Ct. 2281, 2290,
> 76 L.Ed.2d 476 (1983) (quoting Hines v. Anchor
> Motor Freight, Inc., 424 U.S. 554, 570-71, 96 S.Ct.
> 1048, 1059-60, 47 L.Ed.2d 231 (1976)). This is so
> because a hybrid suit is essentially a challenge to
> private settlements reached pursuant to collective
> bargaining agreements. See id.

> "A breach of the statutory duty of fair
> representation occurs only when a union's conduct
> toward a member of the collective bargaining unit
> is arbitrary, discriminatory, or in bad faith."
> Vaca v. Sipes, 386 U.S. 171, 190, 87 S.Ct. 903,

916, 17 L.Ed.2d 842 (1967). If a union arbitrarily ignores a meritorious grievance or "process[es] it in perfunctory fashion," the Union may be found to have violated its implied statutory obligation. Id. at 191, 87 S.Ct. at 917. This does not mean that an employee has an absolute right to have his grievance taken to arbitration. See id.; see also Fajardo v. Foodtown Supermarkets, 702 F.Supp. 502, 506 (D.N.J. 1988). Rather, it means that an employee will have a claim against his union for "conduct which is so acutely perfunctory that it fails to attain a basic level of acceptable performance by a collective bargaining unit." Rupe v. Spector Freight Systems, Inc., 679 F.2d 685 (7th Cir. 1982).

988 F. Supp. 841, 845 (D.N.J. 1997).

Atlantic and the Union put forward two central arguments in support of their motions to dismiss this hybrid claim: that Plaintiffs' claims are all time-barred under the relevant statute of limitations, and that Plaintiffs have failed to exhaust the grievance process outlined in the CBA.  The Court turns first to Defendants' state of limitations arguments.

### 1. LMRA Statute of Limitations

Defendants first contend that Plaintiffs' hybrid LMRA claims are time-barred.  The statute of limitations for a hybrid § 301 claim is six months.  Luongo, 261 F. Supp. 3d at 526 (citing Pagano, 988 F. Supp. at 845).  Although the statute of limitations is technically an affirmative defense which must be pled in an answer, see Fed. R. Civ. P. 8(c)(1), a 12(b)(6) motion may be granted on statute of limitations grounds, but "only when the statute of limitations defense is apparent on the

face of the complaint." Wisniewski v. Fisher, 857 F.3d 152, 158 (3d Cir. 2017) (citing Schmidt v. Skolas, 770 F.3d 241, 249 (3d Cir. 2014)). "To be sustainable, such a dismissal must consider the applicability of tolling doctrines." Luongo, 261 F. Supp. 3d at 526-27 (citing Wisniewski, 857 F.3d at 158).

The employees' knowledge that the union has failed to pursue the requested grievance generally starts the six-month clock running: "[t]he limitations period 'begins to run when the claimant discovers, or in the exercise of reasonable diligence should have discovered, the acts constituting the alleged violation.'" Id. at 527 (quoting Hersh v. Allen Prods. Co., Inc., 789 F.2d 230, 232 (3d Cir. 1986)). Specifically, the Third Circuit has explained that for a hybrid § 301 claim, "where an employee sues a union for breach of its duty of fair representation, the limitations period commences when 'the plaintiff receives notice that the union will proceed no further with the grievance.'" Vadino v. A. Valey Eng'rs, 903 F.2d 253, 260 (3d Cir. 1990) (quoting Hersh, 789 F.2d at 232). Moreover, "[e]ven if there has been no explicit notice, the statute of limitations begins to run when 'the futility of further union appeals became apparent or should have become apparent.'" Id. (quoting Scott v. Local 863, Int'l Bhd. of Teamsters, 725 F.2d 226, 229 (3d Cir. 1984)).

The Union's arguments for dismissal on this front are

straightforward: they note that Plaintiffs have simply not alleged any actions related to their hybrid claim that took place within the six-month period before they filed their Complaint on September 14, 2020.[2]  The Union's argument is not entirely off-base, as the fact that Plaintiffs have not alleged any underlying violations allegedly committed by Atlantic within six months of the filing of their Complaint is of course relevant to the Court's statute of limitations analysis here. However, the Union largely misses the central question here.  As outlined above, the statute of limitations analysis for hybrid § 301 claims focuses on when "the plaintiff receives notice that the union will proceed no further with the grievance," Vadino, 903 F.2d at 260, rather than on when the underlying action by the employer that prompted the grievance occurred.  See Maksin v. United Steel Workers of America, 136 F. Supp. 2d 375, 380 (W.D. Pa. 2000) ("In a § 301 suit, a claim accrues against the company defendant at the same time it accrues against the union defendant, since the predicate for a § 301 action against an employer is proof that the union breached its duty of fair representation.").

---

[2] While the Complaint does allege that Plaintiffs were all terminated by Atlantic on March 14, 2020, both Atlantic and the Union accurately point out that Plaintiffs' hybrid § 301 claim is not based on their termination, but rather only on the preceding wage, benefits, overtime, and pension issues.

Atlantic, in its separate but largely overlapping motion to dismiss, does directly argue that Plaintiffs were sufficiently aware that the Union was not proceeding to represent them in any grievances related to the wage, overtime, benefits, and pension issues outlined in the Complaint more than six months prior to its filing.  The Court agrees that based on the facts alleged in the Complaint and in related documents that are appropriate to consider at this stage, it is clear that Plaintiffs were sufficiently aware, or should have been, that the Union would not be representing them and pursuing their grievances on these topics prior to March 14, 2020.  Their claims are therefore time-barred.

First, although this Complaint was not filed until September 14, 2020, Plaintiff Charles Greenidge had previously filed an unfair labor practices charge with the National Labor Relations Board on April 27, 2018, explicitly charging that the Union had "failed and refused to process the grievance of Charles Greenidge regarding the employer's failure to pay his pension, annuity, vacation, and health benefits for reasons that are arbitrary, discriminatory, or otherwise in bad faith."  (ECF No. 09-4, Ex. A).  In other words, Greenidge, over two years prior to the filing of the Complaint, had explicitly accused the Union, in a filing with the NLRB, of the exact violations he now relies upon as the basis for his hybrid claim.

Plaintiff Greenidge's act of filing an NLRB charge
regarding the exact violations alleged here demonstrates beyond
any doubt that he knew of the Union's actions constituting the
alleged violation by that date, and that his claims are
therefore time-barred.  See Mills v. International Union of
Operating Engineers Local Union 66, 252 F. Supp. 2d 210, 214
(W.D. Pa. 2003) ("Because [Plaintiff] filed a charge with the
NLRB regarding these actions, he clearly knew these actions
could constitute a violation at that date."); Nicol v. United
Steelworkers of America, No. 2:04-cv-1162, 2008 WL 4138104, at
*6 (W.D. Pa. Aug. 29, 2008) (listing cases from numerous other
Circuits and District Courts holding "that a plaintiff has
discovered the grounds for his hybrid § 301 claim, and his claim
has accrued, on the date a charge of breach of the duty of fair
representation is filed with the NLRB"); Lacy v. General Elec.
Co., No. 84-5343, 1986 WL 12948, at *3 (E.D. Pa. Nov. 14, 1986)
(holding on summary judgment that "[Plaintiff] knew that the
union was not going to represent him any further when he so
stated in a sworn statement given to the National Labor
Relations Board  in November, 1982 . . . For these reasons,
plaintiff's complaint against both defendants filed November 10,
1984, is untimely").  And, importantly, "the filing of an NLRB
charge does not toll the statute of limitations for a § 301
action arising out of the same nucleus of operative fact."  Love

16

v. Merck & Co., Inc., No. Civ.A. 04-4878, 2005 WL 146893, at *2
(E.D. Pa. Jan. 21, 2005) (listing supporting precedent).

Plaintiffs, for their part, do not directly address this
argument or the NLRB charge, or put forward any argument
opposing this basis for dismissal.  They do, at one point in
their opposition brief, note that "defendant argues that the
Court ought to consider in the review of these 12(b)(6) motions
the Collective Bargaining Agreement, the Council By-Laws, the
Constitution of the Union, and various documents related to
grievances."  (ECF No. 24 at 11).  However, they make no direct
argument that the Court cannot consider Plaintiff Greenidge's
NLRB charge, nor do they contend that the copy of the charge
filed by Atlantic is inaccurate or inauthentic.

The Court is generally limited to the facts alleged in the
complaint and documents explicitly attached or referenced in the
Complaint when deciding a Rule 12(b)(6) motion to dismiss.
However, it is perfectly appropriate for the Court to consider
matters of public record in other proceedings for purposes of a
motion to dismiss, and courts in this Circuit have long taken
judicial notice of NLRB charges filed by plaintiffs in cases
like the present one.  See, e.g., Mills, 252 F. Supp. 2d at 214
("[Plaintiff's] charge to the Regional Director of the NLRB, and
the Regional Director's correspondence indicating that a formal
complaint would not be filed are public records.  Thus, we may

17

consider those exhibits, the validity of which plaintiff does not dispute, without converting the motion to one for summary judgment under Fed.R.Civ.P. 56(c).") (citing 29 C.F.R. § 102.117(a)(2),(b)(1); Berg v. United Steelworkers of America, Local 3733, No. 98-308, 1998 WL 165005, at *7 (E.D. Pa. Apr. 8, 1998) ("[T]he Court will take judicial notice of the charge filed by plaintiff with the NLRB since it is a matter of public record."); NLRB v. Sears, Roebuck & Co., 421 U.S. 132, 95 S.Ct. 1504, 44 L.Ed.2d 29 (1975) (holding that NLRB documents which constitute final opinions are public record)).

Plaintiff Greenidge's hybrid § 301 claim is therefore unequivocally time-barred, and will be dismissed with prejudice. Defendant Atlantic, in its supporting brief, appears to go so far as to argue that every Plaintiffs' hybrid claims must be considered time-barred based solely on Greenidge's filing of the NLRB charge. The Court does not agree. The charge itself, on its face, related only to the Union's failure to represent Greenidge himself in his grievance, and makes no mention of any other Plaintiff or employee; nor does the Complaint itself make any reference to this charge, or provide any factual allegations that would demonstrate that any other Plaintiff was aware of Greenidge's actions or the filing of the NLRB charge. Defendant has put forward no case law or true argument supporting the idea that Greenidge's knowledge demonstrated in his NLRB charge

18

should be attributed to the other plaintiffs, and the Court declines to make such a finding here at the motion to dismiss stage.

However, the Complaint nonetheless makes clear that the other Plaintiffs similarly had sufficient knowledge that the Union would not be representing their interests related to the issues outlined in the Complaint prior March 14, 2020. Plaintiffs allege that Plaintiffs Lamar Medley, Luis Estrada, and Matthew Chalakee — along with Greenidge — "attempted to attend a Council 711 meeting at the Union Hall in Winslow Township, which occurred on or about January 25, 2019," but were "unlawfully ejected from the meeting."  (ECF No. 1-1 at ¶¶ 35-37).  Plaintiffs, importantly, do not pretend to be unaware of why those four individuals were removed from the Union meeting: while the Complaint states that they were denied access "on the pretense that their union dues were not current," (id. at ¶ 39), Plaintiffs explicitly allege that the Union's actions were direct retaliation for their complaints regarding the pension, wage, and benefits issues, and the Union's failure to represent their interests in a grievance process.

In fact, Plaintiffs make clear in their Complaint that their removal from the Union meeting was actually a direct response to their having raised these concerns with a Union lawyer through their own hired counsel, alleging that "All

19

Plaintiffs, through counsel, have escalated the pension issues to a Council 711 attorney, which has resulted in their being denied access to union meetings and otherwise fair representation in retaliation for their raising concerns with how Council 711 has represented their interests." Id. at ¶ 67. The only plausible reading of these allegations is that Plaintiffs, prior to January 2019, had hired counsel and through that counsel had specifically raised concerns that the Union was not representing their interests regarding the issues underlying their hybrid § 301 claim, and that in response to their having raised these concerns with a Union lawyer, the Union denied four of them access to the January 2019 meeting and denied them fair representation.  And although Plaintiffs only directly allege that they were denied access to the meeting because of their complaints regarding the pension issues without explicitly mentioning the other conduct, this is not the end of Plaintiffs' allegations on this front.  According to the Complaint, Plaintiffs responded to their denial of access to the meeting by having their counsel send another letter to all Defendants in March 2019, demanding to know why they were not being permitted the opportunity to take part in discussions regarding negotiation of a new CBA.

Plaintiffs cannot simultaneously allege both that (1) they hired counsel to address the Union's representation of them

regarding the underlying issues with Atlantic and through that counsel raised their concerns with a Union lawyer, which subsequently resulted in four of them being denied access to a January 2019 Union meeting, being denied the ability to provide input on CBA negotiations, and finally in their lawyers sending another unanswered letter to Defendants in March 2019, and that (2) they were unaware that the Union was not going to represent them regarding their grievances against their employer until after March 14, 2020.  There can be no debate that, at the very least, Plaintiffs Greenidge, Medley, Estrada, and Chalakee, after being denied access to the January 2019 meeting, were aware of the specific violations they are alleging against the Union here.[3]

The Complaint here contains clear factual allegations that the entire group of Plaintiffs had retained counsel for the purposes of raising the fair representation concerns to counsel for the Union prior to the January 2019 Union meeting, that the Union's actions in denying four of the Plaintiffs access to that meeting was directly intended as retaliation for Plaintiffs'

---

[3] To the extent that Plaintiff Greenidge's NLRB charge against the Union did not explicitly reference the overtime payment concerns alleged in the Complaint and therefore may not have started the running of the statute of limitations as to that claim, the limitations period would at least have begun at the same time as it did for the rest of the Plaintiffs and would still be time-barred.

counsel having raised such concerns, and that they then further utilized their counsel to send the unanswered March 2019 letter to Defendants after that meeting.  Faced with these clear facts, the Court finds that the remaining Plaintiffs were also aware by early 2019 of that the Union's actions may constitute violations that could sustain a valid hybrid § 301 claim, and that the six-month statute of limitations for their claims therefore started running at that time.

Plaintiffs, for their part, have largely failed to mount any plausible opposition to these facts and the arguments put forth by Defendants.  Plaintiffs' opposition brief first attacks the additional documents that Defendants have attached to their 12(b)(6) briefs arguing that they "raise more questions than they resolve."  The Court will not address this section of their brief besides to note that Plaintiffs' argument centered around a paragraph containing 11 consecutive unanswered questions rather than any legal arguments in no way addresses or rebuts the statute of limitations issues raised in this Opinion.

Plaintiffs' opposition brief then puts forward three short, separate sections posing arguments that are only slightly more relevant to the case at hand.  First, Plaintiffs argue that the statute of limitations "Does Not Facially Apply to Claims for Wrongful Discharge."  (ECF No. 24 at 13).  Plaintiffs are certainly correct that Defendants' statute of limitations

arguments do not apply to any hybrid § 301 claims for wrongful
discharge in this action, because no such claims exist.  Count I
of the Complaint includes a specific list of underlying alleged
violations that serve as the bases for Plaintiffs' hybrid § 301
claim, and their termination on March 14, 2020 is not among
them.  (ECF No. 1-1 at 10-11 ¶¶ 1-8).  Plaintiffs did not bring
such a claim in this action and may not amend their Complaint
now in opposition to a motion to dismiss to attempt to avoid
dismissal of Count I of the Complaint.[4]

Plaintiffs' second argument is even more inapplicable than
their first.  Plaintiffs' brief includes a large block quote
from a proposed version of NLRB Final Rule 9354, which would
have required employers to provide notice to their employees of
their rights under the National Labor Relations Act by
displaying a poster and would have tolled the six-month statute
of limitations for certain claims in cases where no such notice
had been posted.  (ECF No. 24 at 14).  But this argument runs
into three serious, fatal issues: (1) the language Plaintiffs
emphasized in the proposed version of the rule applied only to

---

[4] The Court assumes that Plaintiff made a strategic decision not
to raise an LMRA claim related to their termination, as the
Complaint includes no allegations that Plaintiffs attempted to
exhaust the internal union grievance process regarding their
termination, which as the Court will discuss below is a
necessary precondition to bringing such a claim.  They may not
attempt to save their labor law claims now by asserting such a
claim in an opposition brief.

23

unfair labor practices claims and did not reference hybrid § 301
claims, (2) the final version of that rule as enacted by the
NLRB did not include the tolling language relied upon by
Plaintiffs, see 79 FR 74307(as corrected by 80 FR 19199),  and
(3) even if it did, Plaintiffs raised no such claims or factual
allegations in their Complaint, and may not amend their
complaint through factual allegations first raised in an
opposition brief.  Hall v. Revolt Media & TV, LLC, No. 17-2217
(JMV) (MF), 2018 WL 3201795, at *3 (D.N.J. 2018) (citing Com. Of
Pa. ex rel. Zimmerman v. PepsiCo, Inc., 836 F.2d 173, 181 (3d
Cir. 1988)).

Finally, Plaintiffs' brief includes a section titled "The
Continuous Violation Doctrine Tolls the Statute of Limitations."
(ECF No. 24 at 14-15).  Plaintiffs correctly identify the
existence of the continuing violation doctrine, and that in
certain circumstances that doctrine may result in the tolling of
a statute of limitations.  Plaintiffs, however, do not actually
argue that this should be the case here.  Plaintiffs' brief
includes three short paragraphs outlining the doctrine, and
nothing else; their brief includes no application of the
doctrine, and points to no allegations of continuing violations
that would warrant this Court tolling the relevant statute of
limitations for their hybrid § 301 claim.  In fact, as
Defendants accurately point out, the only factual allegations in

the entire Complaint that fall within six months of September 14, 2020 are Plaintiffs' allegations that they were terminated on March 14, 2020.  However, as noted above, Plaintiffs hybrid § 301 claim is not related to their termination, and does not include their termination as one of its bases.

Nor does the Court believe that Plaintiffs could have raised a valid continuing violation argument here.  As explained above, the statute of limitations for hybrid § 301 claims begins to run when the plaintiffs are aware that the union will not represent their concerns or proceed with their grievance.  Here, the Court has already found that Plaintiffs either knew, or clearly should have known, that the Union would not represent them regarding their complaints that Atlantic had violated the CBA by March of 2019 at the latest.  Plaintiffs, in another section of their brief, do assert that "[i]t is a reasonable inference from the Complaint that the plaintiffs continued to request and expect that the Union would intervene until they lost their jobs on March 14, 2020, or thereafter."  (ECF No. 24 at 16).  It should first be clarified that while the Court must accept Plaintiffs' facts as true and read the complaint in the light most favorable to Plaintiff at this stage, it may not read into complaints facts that were not pled by the plaintiffs and which are in no way supported by the factual allegations that were pled.

However, even had Plaintiffs made such allegations, the Court finds that this would not constitute a continuing violation — a finding that is directly relevant to Plaintiffs' request to have the opportunity to amend their Complaint if the Court grants Defendants' motions.  For the purposes of Plaintiffs' hybrid § 301 claims, the Union's alleged violation of its duty of fair representation occurred at the moment it was clear to Plaintiffs that it would not represent them in connection with their grievances regarding Atlantic's alleged underlying violation of the CBA, and the clock started running then.  To the extent that Plaintiffs continued to repeat their request that the Union represent their interests, and the Union continued not to do so, the Court declines to find that such actions or omissions are sufficient to establish a continuing violation.

The Court declines to do so for a simple reason: our courts have repeatedly emphasized the importance of quick resolution of labor disputes, with the Supreme Court having specifically described the "relatively rapid disposition of labor disputes" as a central goal of both labor law generally and of the six-month statute of limitations governing § 301 claims in particular.  Auto Workers v. Hoosier Cardinal Corp., 383 U.S. 696, 707, 86 S. Ct. 110, 716 L.Ed.2d 192 (1966).  Were the Court to view claims like Plaintiffs' as asserting a valid continuing

26

violation, it would largely erase the import of the six-month statute of limitations in cases like this altogether, by allowing parties to simply re-start the clock on the same violation by repeating the same request that had already been rejected or ignored multiple times and which they had every reason to believe would be rejected or ignored again.

Courts around the country, faced with similar cases, have repeatedly reached this same conclusion and rejected such arguments. See, e.g., Ganny v. F.J.C. Security Services, Inc., No. 15-CV-1965 (JG)(JO), 2015 WL 4600745, at *4-5 (E.D.N.Y. July 28, 2015) ("[Plaintiff] knew as early as February 11, 2013, when he filed his NLRB charge, that Local 32BJ would not represent his grievance that the assignment to a non-HRA location violated the Settlement Agreement. The statute of limitations began to run at that point and Local 32BJ's refusal to take up the same grievance in September 2014 would not toll or otherwise preclude its running."); Dudich v. United Auto Workers Local Union No. 1250, 454 F. Supp. 2d 668, 678-79 (N.D. Ohio 2006) (denying continuing violation argument for hybrid § 301 claim based on repeated usage of incorrect seniority date because "[o]nce the original damage is lodged, the mere fact that the Defendants are 'continuing' to implement allegedly improper collective bargaining agreements does not convert Plaintiffs' loss of jobs into a 'continuing violation.'") (quoting Bloedow v. CSX

27

Transportation, Inc., 319 F. Supp .2d 782, 788 (N.D. Ohio
2004));   Int'l Longshoremen's Ass'n Steamship Clerks Local 1624,
AFL-CIO v. Va. Int'l Terminals, Inc., No. Civ. A. No. 2:95CV274,
1995 WL 902670, at *5 (E.D. Va. May 22, 1995) (declining to find
that the repeated application of a policy regarding timekeeping
constituted a continuing breach of a collective bargaining
agreement that would toll the statute of limitations for a
hybrid § 301 lawsuit, because "[s]uch a holding would be
contrary to the underlying policy of federal labor law of the
'relatively rapid disposition of labor disputes'"); Flanigan v.
Int'l Bhd. of Teamsters, Truck Drivers Local No. 671, 942 F.2d
824, 827 (2d Cir. 1991) (holding that duty of fair
representation claim was time-barred because the workers had
learned that their union interpreted the CBA "to preclude the
bumping by seniority that appellants claimed as their right"
more than six months prior to filing the complaint, and any
subsequent failure to act by the union "cannot be treated as a
continuing violation that precluded the running of the
limitation period").

    Plaintiffs, whose own Complaint clearly demonstrates their
knowledge of the violations serving as the basis for their
hybrid § 301 claims, is unable to evade the statute of
limitations.  It therefore finds not only that Plaintiffs have
failed to demonstrate a continuing violation and that their

hybrid § 301 claims are time-barred, but also that amendment would be futile and such claims must be dismissed with prejudice.

### 2. Exhaustion of Remedies

The Union further argues that Plaintiffs have failed to exhaust the grievance process they are required to engage in under their CBA before filing this action.  While the Court's finding that Plaintiffs' hybrid § 301 claims are time-barred is sufficient on its own to grant Defendants' motions to dismiss as to those claims, the Court finds that multiple Plaintiffs' claims would still fail even had the statute of limitations not expired.

It has long been established that "[a]n employee seeking a remedy for an alleged breach of the collective-bargaining agreement between his union and employer must attempt to exhaust any exclusive grievance and arbitration procedures established by that agreement before he may maintain a suit against his union or employer under § 301(a) of the Labor Management Relations Act[.]"  Kush v. United Food & Commercial Workers Union Local 152, No. 12-2120 (FLW), 2013 WL 2096626, at *4 (D.N.J. May 14, 2013) (quoting Wheeler v. Graco Trucking Corp., 985 F.2d 108, 112 (3d Cir. 1993).  And "even if a union member has been 'mistreated by his bargaining representative,' each union member 'must also avail himself of his intra-union

29

remedies before turning to the courts for relief.'" May v. Elk
Pipeline, Inc., No. 18-10311 (RBK/AMD), 2021 WL 1040509, at *3
(D.N.J. March 18, 2021) (quoting Pawlak v. Int'l Bhd. of
Teamsters, Chauffeurs, Warehousemen, & Helpers of Am., Local
Union No. 764, 444 F. Supp. 807, 810 (M.D. Pa. 1977), aff'd, 571
F.2d 572 (3d Cir. 1978)).  "If there is a manner by which the
mistreatment or mishandling of a grievance can be challenged,
the employee must avail himself of that process." Id. (citing
Kush, 2013 WL 2096626 at *4).  Finally, any allegations put
forth that a plaintiff attempted to exhaust the specific union
remedies outlined in their CBA must be "substantiated by facts
that indicate what procedures the [union member] attempted to
follow." Id. (citing Rehm v. Quaker Oats Co., 478 F. Supp. 619,
620 (M.D. Pa. 1979) (finding that "[e]ven if the Local Union
officers did not act on Plaintiff's request, he has failed to
allege that he tried to pursue any further remedy, or that none
was available. Therefore ... the Complaint fails to allege the
requisite complete exhaustion of internal Union remedies, nor
does it allege that all efforts to pursue such procedures have
been frustrated.")).

     The CBA here provides for a specific grievance process that
Plaintiffs were required to have followed before bringing their
hybrid § 301 claims.  Article XVI of the parties' CBA includes
specific procedures for filing and pursuing a grievance.  Within

fourteen days after the events that is resulting in the complaint having occurred, the employee must "file a written grievance that describes in general terms the nature of the occurrence," and a copy of that grievance "must be delivered to the employee's immediate supervisor and/or the Employer's designated labor relation supervisor and a copy must also be forwarded to the Business Manager/Secretary-Treasurer of the District Council." (ECF No. 33-1 at 15).  The CBA provides additional details for further steps and arbitration of grievances as well.  Id.

Here, the Complaint only specifically alleges that Plaintiffs Medley, Greenidge, and Estrada filed grievances related to any of the underlying violations alleged here.  While the Court acknowledges that, at one point in the Complaint, Plaintiffs do include a conclusory assertion that "Plaintiffs have unsuccessfully grieved these issues," (ECF No. 1-1 at 11, ¶ 5), just one page earlier Plaintiffs specifically conceded that "[v]arious Plaintiffs, not all, have grieved this pension issue with Council 711 with no response to their questions," and then listed the three Plaintiffs named above as the only parties to have filed such grievances.  Id. at ¶¶ 65-66.  Accordingly, since the Complaint itself acknowledges that no other Plaintiff filed a grievance and pursued their complaints through the CBA's specified grievance process, Plaintiffs David Rolls, Jose Lous

Carreon, Matthew Chalakee, Rafael Flores, and Marlon Gibbs have failed to allege that they satisfactorily "followed the mandatory grievance procedure," which is fatal to their claims. May, 2021 WL 1040509 at *4.  And as the above quote from the Complaint makes clear, even those Plaintiffs who did pursue grievances are only alleged to have done so for the pension-specific issues, not their wage, overtime pay, or other benefits concerns.  Accordingly, to the extent that these claims were not already time-barred, they must also be dismissed for failure to exhaust their internal union grievance process.

The closest thing to a counterargument Plaintiffs put forward on this front is the conclusory statement, found only in a section-heading, that "The Exhaustion of Internal Grievance Remedies Does Not Apply Until it is Clear that Further Attempts at Using the Existing Grievance Mechanism Would be Futile." (ECF No. 24 at 16).  The Court assumes that Plaintiffs did not intend to argue they only had to exhaust their internal remedies after they determined that doing so would be futile, and in fact intended to raise the exact opposite argument.  The Supreme Court has held that district courts have discretion to excuse the exhaustion requirement, although they must be guided by three factors: "(1) "whether union officials are so hostile to the employee that he could not hope to obtain a fair hearing on his claim;" (2) "whether the internal union appeals procedures

would be inadequate either to reactivate the employee's grievance or to award him the full relief he seeks under § 301;" and (3) "whether exhaustion of internal procedures would unreasonably delay the employee's opportunity to obtain a judicial hearing on the merits of his claim." <u>Clayton v. Int'l Union, United Auto., Aerospace, & Agr. Implement Workers of Am.</u>, 451 U.S. 679, 689 (1981).  A court may properly excuse the employee's failure to exhaust in the presence of any of these factors.  <u>May</u>, 2021 WL 1040509 at *4 (citing <u>Keister v. PPL Corp.</u>, 253 F. Supp. 3d 760, 775 (M.D. Pa. 2015)).

Plaintiffs, once again, fail to demonstrate the existence of any of these factors.  Besides the brief statement in a section heading, Plaintiffs have failed to actually argue that it would have been futile to attempt to exhaust their internal grievance procedures.  Nor have they put forward sufficient allegations in their Complaint to convince this Court that it would be appropriate to exercise its discretion and excuse the exhaustion requirement in this case.  Therefore, each of the hybrid § 301 claims of Plaintiffs David Rolls, Jose Lous Carreon, Matthew Chalakee, Rafael Flores, and Marlon Gibbs, as well as the non-pension-related claims of Plaintiffs Medley, Greenidge, and Estrada, must be dismissed for this additional reason as well.

B. <u>Preemption under the LMRA</u>

33

With Plaintiffs' federal claims under the LMRA being
dismissed, the only remaining claims in this action are brought
pursuant to state common law and state antidiscrimination law:
Count II of Plaintiffs' Complaint alleges a claim for unjust
enrichment against Defendant Atlantic, Count III raises claims
under the NJLAD against both Atlantic and the Union, and Count
IV raises a claim for failure to account against the Pension
Fund.  "[W]hen all federal claims against a party have been
eliminated from a case, the district court may, in its
discretion, decline to extend supplemental jurisdiction over the
remaining state law claims." Rothman v. City of Northfield, 716
F. Supp. 2d 369, 373 (D.N.J. 2010) (citing Lentz v. Mason, 961
F. Supp 709, 717 (D.N.J. 1997)).

However, the Court recognizes that Atlantic and the Union
have both raised arguments that Plaintiffs' unjust enrichment
and NJLAD claims are preempted by the LMRA.  And as the Supreme
Court has made clear, the doctrine of complete preemption
applies in the context of claims preempted by § 301 of the LMRA,
meaning that the LMRA's preemptive force is so "extraordinary"
that it "converts an ordinary state common-law complaint into
one stating a federal claim for purposes of the well-pleaded
complaint rule." Caterpillar, Inc. v. Williams, 482 U.S. 386,
393 (1987) (quoting Metropolitan Life Insurance Co. v. Taylor,
481 U.S. 58, 65, 107 S. Ct. 1542, 1547, 95 L.Ed.2d 55 (1987)).

34

Accordingly, the Court will first discuss the doctrine of federal preemption of state law claims under the NJLAD, and will then proceed to address Defendants' LMRA preemption arguments regarding Plaintiffs' state law claims, before deciding whether any remaining claims should be remanded to state court.

### 1. LMRA Preemption Doctrine

Section 301(a) of the LMRA provides for federal jurisdiction over disputes regarding collective bargaining agreements.  29 U.S.C. § 185(a).  More importantly, § 301 "mandate[s] resort to federal rules of law in order to ensure uniform interpretation of collective-bargaining agreements, and thus to promote the peaceable, consistent resolution of labor-management disputes."  Lingle v. Norge Div. of Magic Chef, Inc., 486 U.S. 399, 404, 108 S. Ct. 1877, 100 L.Ed.2d 410 (1988). "Because § 301 requires the creation of uniform federal labor law to ensure uniform interpretation of collective bargaining agreements, and because state laws might produce differing interpretations of the obligations imposed by such agreements, the Supreme Court has held that 'a suit in state court alleging a violation of a provision of a labor contract must be brought under § 301 and be resolved by reference to federal law.'" Snyder v. Dietz & Watson, Inc., 837 F.Supp.2d 428, 437-38 (D.N.J. 2011) (quoting Allis-Chalmers Corp. v. Lueck, 471 U.S. 202, 210, 105 S. Ct. 1904, 85 L.Ed.2d 206 (1985).

Therefore, "if the resolution of a state-law claim depends upon the meaning of a collective-bargaining agreement, the application of state law ... is preempted" by federal labor law. Lingle v. Norge Div. of Magic Chef, Inc., 486 U.S. 399, 406, 108 S. Ct. 1877, 100 L.Ed.2d 410 (1988). And this preemption is not limited to contracts claims: instead, the Supreme Court has held that "when resolution of a state-law claim is substantially dependent upon analysis of the terms of an agreement made between the parties in a labor contract," even in the context of tort claims, the claim is preempted by § 301 and must be decided pursuant to federal labor contract law. Lueck, 471 U.S. at 220, 105 S. Ct. 1904.

However, preemption of state law claims under the LMRA is limited in scope: "Not every dispute concerning employment, or tangentially involving a provision of a collective-bargaining agreement, is preempted by § 301 or other provisions of federal labor law ... it would be inconsistent with congressional intent under that section to pre-empt state rules that proscribe conduct, or establish rights and obligations, independent of a labor contract." Id. at 211–212. The LMRA thus has no preemptive effect where there are "state rules that proscribe conduct, or establish rights and obligations, independent of a labor contract," id. at 212, or "where the state law claim can be resolved without substantially interpreting the collective

bargaining agreement itself."  Id. at 220; see also Lingle, 486
U.S. at 409-10.  The relevant inquiry is whether "resolution of
Plaintiffs claim [] require[s] 'interpretation' of the
[relevant] CBA," or at least will "involve 'a substantial issue
of construction and operation of the CBA[.]'"  LaResca v. AT&T,
161 F. Supp. 2d 323, 330-31 (D.N.J. 2001).  The simple fact that
a case involves "reference to or consideration of the terms of a
collective-bargaining agreement" does not warrant preemption, as
this does not signal that the litigated issues require
interpretation of the CBA.  Id. at 330 (quoting Ramirez v. Fox
Television Station, Inc., 998 F.2d 743, 749 (9th Cir. 1993)).

A court must, on a "case by case basis," determine whether
the state law claims are "inextricably intertwined with
considerations of the terms of the labor contract." Lueck, 471
U.S. at 213, 220.  When a court determines that a state-law
claim is subject to preemption and arises under federal law, the
court may either treat the claim as a LMRA claim or dismiss the
claim as preempted.  Id. at 220.

### 2. Unjust Enrichment Claim

The Court therefore must assess whether Plaintiffs' state
law claims are preempted under this doctrine.  Count II of the
Complaint specifically asserts that, based on the same
allegations underlying their claims in Count I, "Plaintiffs,
through their labor, have conferred a benefit upon defendant

37

Atlantic Exposition," for which they expected renumeration, and "[i]t would be unjust and inequitable for the defendants Atlantic Exposition to retain the benefit conferred upon it." (ECF No. 1-1 at 11-12, ¶¶ 3-5).  "To establish unjust enrichment, a plaintiff must show both that defendant received a benefit and that retention of that benefit without payment would be unjust."  VRG Corp. v. GKN Realty Corp., 135 N.J. 539, 554, 641 A.2d 519 (N.J.1994) (citations omitted).  "The unjust enrichment doctrine requires that plaintiff show that it expected remuneration from the defendant at the time it performed or conferred a benefit on defendant and that the failure of remuneration enriched defendant beyond its contractual rights."  Id. (citations omitted).

      As described above, Defendant Atlantic argues that Plaintiffs' unjust enrichment claim is preempted by the LMRA. Plaintiffs, for their part, simply contend that their unjust enrichment claim is pled "in the alternative," and that "[t]here is no federal interest in the common law of quasi-contract or unjust enrichment.  Thus, there can be no federal interest in Count II."  (ECF No. 24 at 17).  Once again, Plaintiffs' fails to address the more narrow and central point.

      Plaintiffs' unjust enrichment claim here is clearly preempted under this doctrine, because determining whether Plaintiffs had any reasonable expectation of remuneration beyond

that which they received for their work would necessarily require interpretation of the CBA.  In analyzing whether Atlantic unjustly enriched itself by "neglecting, failing, and/or refusing to pay wages, overtime, and benefits earned by the plaintiffs" and by withholding "a 'check-off' of 3-5% in return for unspecified benefits," (ECF No. 1-1 at 10-11, ¶¶ 2-3), a trier of fact would have to review the terms of the CBA and determine whether Plaintiffs were due such wages, overtimes, or benefits, or whether a "check-off" of 3-5% was improper in this situation.  Therefore, "[b]ecause resolution of the unjust enrichment claim will require the interpretation of the terms of the CBA . . . the Court finds that Plaintiff's unjust enrichment claim is preempted by § 301 and is subject to dismissal without prejudice." Snyder v. Dietz & Watson, Inc., 837 F. Supp. 2d 428, 443 (D.N.J. 2011).

### 3. NJLAD Claims

Plaintiffs' next claims, found in Count III of the Complaint, center on a series of alleged violations of the NJLAD by both Atlantic and the Union.  Count III, while nominally being listed as one claim for violation of the NJLAD, incorporates numerous separate and distinct factual allegations that Plaintiffs contend were discriminatory.  From the Court's reading of the Complaint, Plaintiffs' NJLAD claims, including both those explicitly noted in Count III and those incorporated

from other sections of the Complaint, can be separated into
three general categories: (1) claims centered on the same
pension, wage, overtime pay, and benefits issues that served as
the bases for their hybrid § 301 claims; (2) claims that the
Union negotiated better collective bargaining agreements on
behalf of white Union members working for other employers than
it did for Plaintiffs, and mistreated them in a series of other
ways, due to their race, national original, color, and
ethnicity; and (3) claims that their termination on March 14,
2020 was due to the race, national origin, color, and ethnicity
of the Plaintiffs and their actions in complaining about the
previously referenced issues.

   As explained above, both Atlantic and the Union argue that
Plaintiffs' NJLAD claims are also preempted by the LMRA.
Plaintiffs, on the other hand, argue that the LMRA does not
preempt state law discrimination claims under the NJLAD like
those they have put forth here.  The Court has already outlined
the general contours of federal preemption of state law claims
under the NLRA above in its analysis of Plaintiff's unjust
enrichment claims, and as both parties acknowledge, the Third
Circuit has previously addressed the intersection of federal and
state law regarding LMRA preemption in substantial detail.  See
N.J. Carpenters v. Tishman Constr. Corp., 760 F.3d 297, 306 (3d
Cir. 2014) (finding § 301 "cannot be read broadly to pre-empt

nonnegotiable rights conferred on individual employees as a matter of state law"); Kline v. Sec. Guards, Inc., 386 F.3d 246, 256 (3d Cir. 2004) (identifying "dispositive question [in pre-emption analysis] is whether Appellants' state claims require an interpretation of a provision of the CBA"); Voilas v. GMC, 170 F.3d 367, 378 (3d Cir. 1999) (finding no pre-emption because plaintiff's "claim in this case is not directly based upon the [CBA] ... nor will the resolution of the elements ... require the interpretation of those bargaining agreements"); Cf. Antol v. Esposto, 100 F.3d 1111, 1117 (3d Cir. 1996) (finding pre-emption of plaintiff's Pennsylvania Wage Payment and Collection Law claims because the "suit [was] based 'squarely on the terms of the collective bargaining agreement') (citing Wheeler v. Graco Trucking Corp., 985 F.2d 108, 113 (3d Cir. 1993)).

The specific impact of the LMRA preemption doctrine on NJLAD claims is also far from a topic of first impression. Instead, as this Court itself has previously noted, "there is no dearth of cases addressing the LMRA's lack of pre-emptive effect on the NJLAD among New Jersey District courts. In fact, 'District of New Jersey courts have consistently determined that claims under the NJLAD are separate and independent from the terms of labor contracts.'" Tarby v. B.J. McGlone & Co., Inc., No. 16-1367 (NLH/AMD), 2016 WL 7217596, at *4 (D.N.J. Dec. 13, 2016) (quoting Naples v. N.J. Sports & Exposition Auth., 102 F.

Supp. 2d 550, 553 (D.N.J. 2000)).  <u>See</u> <u>id</u>. (collecting cases).

     Given this clear line of precedent, the Court has little difficulty in finding that Plaintiffs NJLAD claims based on the second and third categories of Plaintiffs' claims are not preempted by the LMRA.  Plaintiffs have directly asserted that the Union has negotiated better CBAs for their white members than they did for Plaintiffs, that the Union denied them access to meetings, the ability to examine their books, and recognition as full members of the Union on that same basis, and that Plaintiffs were terminated by Atlantic due to their race, national origin, color, and ethnicity and in retaliation for their actions in raising concerns about these alleged discriminatory acts.  Plaintiffs therefore are straightforwardly seeking only enforcement of their rights not to be discriminated against under the state anti-discrimination law, "which defines the right without reference to any collective bargaining agreement."  <u>Patterson v. ExxonMobil Corp.</u>, 262 F. Supp. 2d 453, 466 (D.N.J. 2003); N.J.S.A. 10:5-1.  The Court sees no basis for finding that analysis of any such claims would center on an interpretation of the CBA.  Simply put, if such standard discrimination claims as these are preempted by the LMRA, then "all discrimination actions brought by unionized employees would be preempted because the starting point for every case would have to be the [collective-bargaining] agreement."  <u>Coefield v.</u>

<u>Jersey Cent. Power & Light Co.</u>, 532 F. Supp. 2d 685, 697 n.8
(D.N.J. 2007).

Defendants have largely failed to dispute this conclusion
regarding potential LMRA preemption of these categories of
Plaintiffs' NJLAD claims, and instead focused their moving
briefs almost entirely on Plaintiffs' first category of claims
related to the pension, wage, overtime pay, and benefits issues
that were mostly raised on page 13, ¶ 6 of the Complaint.  Their
arguments are rather straightforward: that Plaintiffs NJLAD
claims related to these issues directly incorporate the same
factual allegations that were the basis for their nearly
identical hybrid § 301 claims, and would require the Court to
focus on interpretation of the CBA under federal labor law to
assess their validity.

Plaintiffs, unsurprisingly, point the Court to its own
prior language in <u>Tarby</u>, and argue that the substantial number
of cases in this district rejecting arguments that the LMRA
preempts NJLAD claims demand that this Court reject Defendants'
preemption arguments.  While the Court, for the most part,
agrees with Plaintiffs, it does find that one individual claim
is subject to LMRA preemption: their claim that Atlantic's
failure to make pension contributions was discriminatory.

The Court understands that, as a general rule, claims
asserting discrimination under the NJLAD are "derived

independently from state law, and not from the obligations
assumed by the parties under [a CBA].'" Boone v. Local Union
475 Pipefitters/Steamfitters, No. CV 16-5482 (JLL), 2016 WL
7325472, at *2 (D.N.J. Dec. 16, 2016).  And the Court readily
agrees with the consistent prior holdings of the judges of this
District, including the undersigned, that discrimination claims
under the NJLAD are therefore generally not preempted by the
LMRA — in fact, the Court's research has discovered that the
case law on this issue in the District of New Jersey has been
remarkably consistent in holding that a variety of different
NJLAD claims were not preempted by the LMRA.

   However, the Court finds that Plaintiffs here have put
forth one NJLAD claim that is both uniquely dependent on their
underlying CBA and explicitly pled to incorporate contractual
interpretation in a manner that is fundamentally different from
the claims analyzed in prior cases in this District, and thus
warrants a different conclusion.  First, the Court finds it
relevant to note that in this Court's prior Opinion in Tarby, as
in many of the cases cited there and which later relied on
Tarby, the claims raised by the plaintiffs were purely state law
claims focused on discrimination; for this reason, a significant
percentage of the District of New Jersey case law on this topic
appears to have actually arisen in the context of defendants'
removal of state court actions to federal court, and has

44

involved courts repeatedly rejecting the argument that the LMRA completely preempts NJLAD claims such that federal courts have jurisdiction over complaints that raise no independent federal causes of action. Tarby, 2016 WL 7217596, at *4 (granting motion to remand for lack of subject matter jurisdiction since Plaintiffs' NJLAD claims were not completely preempted by the LMRA). See also Anderson v. Verizon New Jersey Inc., No. 13-4777, 2019 WL 630845 (D.N.J. Feb. 14, 2019) (remanding case because NJLAD claims were not completely preempted by NJLAD); Gardrie v. Verizon New Jersey Inc., No. 15-3538, 2019 WL 630849 (D.N.J. Feb. 14, 2019) (same); DiGiovacchino v. Pipefitters Local Union No. 274, No. 2:18-cv-09000 (MCA)(CLW), 2018 WL 5115571 (D.N.J. Oct. 3, 2018), report and recommendation adopted 2018 WL 5112455 (D.N.J. Oct. 19, 2018) (granting motion to remand for lack of subject matter jurisdiction since Plaintiffs' NJLAD claims were not completely preempted by the LMRA); Boone, 2016 WL 7325472 (remanding case because NJLAD claims were not completely preempted by NJLAD).

That is not the case here. Instead, a close reading of the Complaint reveals that Plaintiffs simply cannot persuasively argue that their NJLAD claim based on Atlantic's failure to make pension contributions is truly independent from their LMRA claims and does not require a substantial interpretation of the CBA. Unlike the plaintiffs in essentially every other District

45

of New Jersey case this Court has reviewed, Plaintiffs here chose to separately allege a federal LMRA claim based on the exact same issue and relying on the exact same factual allegations in the same Complaint: the Complaint directly asserts, as Count I, a hybrid § 301 claim contending that Atlantic has breached the CBA by failing to make pension contributions, and that the Union breached its duty of fair representation by not assisting Plaintiffs in pursuing a resolution to this breach of the CBA.  Count III, nominally putting forth NJLAD claims, incorporates that allegation, and simply adds the additional assertion that Atlantic failed to make those pension contributions because of Plaintiffs' race, national origin, ethnicity, and color.

But more importantly, it must be emphasized that Defendants have in no way stretched the language of the Complaint in arguing that it directly incorporated the question of the proper interpretation of the CBA's pension-contribution provisions into Plaintiffs' NJLAD discrimination claim.  The Complaint incontrovertibly did exactly that, alleging:

> 43. Article XI (a) of this Warehouse Agreement requires the employer, i.e., Atlantic Exposition, to make contributions to the Pension and Annuity for each hour paid by the employer for each worker classification referenced in the Warehouse Agreement.

> 44. Warehouse workers are unquestionably referenced in the Warehouse Agreement.

46

45. The Warehouse Foreman, a white male who is directly covered and subject to the terms and provisions of the Warehouse Agreement, has received the full benefit of his hours, towards Pension and Annuity benefits, worked under the Warehouse Agreement.

46. Atlantic Exposition has made the requisite contributions towards Pension and Annuity benefits for this white Workhouse Foreman covered under the Warehouse Agreement, but not for Plaintiffs, all of which are Black, Latino, or Native American.

(ECF No. 1-1 at ¶¶ 43-46).

In other words, Plaintiffs have affirmatively chosen to place the question of how the CBA's pension-contribution provisions should be interpreted at the core of their NJLAD claim.  And, notably, Plaintiffs' Complaint further alleges that the only employee to receive pension contributions, the Warehouse Foreman, who is a white man, "has a separate agreement which entitles him to a pension/annuity" - meaning that any analysis of an NJLAD claim that relied on the difference in treatment between Plaintiffs and the white Warehouse Foreman may further require this Court to interpret that separate agreement and any potential differences between it and the CBA.  (ECF No. 1-1 at ¶ 62).

Of course, "[t]here is a difference between 'interpreting' the CBA and referring to it as part of a defense:"

> Reference to or consideration of the terms of a collective-bargaining agreement is not the equivalent of interpreting the meaning of the terms. If it were, all discrimination actions brought by unionized employees would be preempted because the starting

47

point for every case would have to be the agreement.
Although the line between reference to and
interpretation of an agreement may be somewhat hazy,
merely referring to an agreement does not threaten the
goal that prompted preemption -- the desire for uniform
interpretation of labor contract terms.

Barone v. Public Service Electric and Gas Company, No. 18-cv-16569-KM-JBC, 2019 WL 3297230, at *6 (D.N.J. July 22, 2019) (quoting LaResca, 161 F. Supp. 2d at 326, 330).  The Court agrees with that explanation, and further agrees that, in the vast majority of cases, an NJLAD claim will not require an interpretation of a CBA.  However, unlike every case in this district that the Court has reviewed in its assessment of the motions before it, Plaintiffs' pension contribution claim appears, on its very face, to require more than simple reference to or consideration of the terms of their CBA.

A quick review of the elements Plaintiffs would need to prove to succeed on their claim is illustrative.  To demonstrate the elements of *prima facie* case of discrimination under the NJLAD, "a plaintiff must first establish that: (1) she is a member of a protected class; (2) she was qualified for the position in question; (3) she suffered an adverse employment action; and (4) that adverse employment action gives rise to an inference of unlawful discrimination."  Tourtellotte v. Eli Lilly and Co., 636 F. App'x. 831, 843 (3d Cir. 2016) (citing Jones v. Sch. Dist. of Phila., 198 F.3d 403, 410-11 (3d Cir.

48

1999)).  Central to this analysis, therefore is the question of
whether an individual suffered an "adverse employment action"
that could plausibly give rise to an inference of unlawful
discrimination.  To constitute an adverse employment action, and
employer's conduct "must be 'serious and tangible enough to
alter an employee's compensation, terms, conditions, or
privileges of employment.'"  Tourtellotte, 636 F. App'x. at 843
(quoting Cardenas v. Massey, 269 F.3d 251, 263 (3d Cir. 2001)).

The Court, however, sees no means of assessing whether
Plaintiffs here truly suffered an adverse employment action that
could demonstrate discrimination without first determining
whether Plaintiffs were entitled to pension contributions from
Atlantic.  Plaintiffs directly allege that Atlantic was required
to make pension contributions on Plaintiffs' behalf under the
CBA and did not do so for discriminatory reasons; their claim,
on its face, is dependent on the factual assertion that the CBA
required Atlantic to make pension contributions, and accordingly
implies that if pension contributions were not required,
Atlantic's failure to make those contributions may not be an
adverse employment action.  See Bryson v. City of Wilmington,
No. 17-133 (JFB/SRF), 2019 WL 181319, at *10 (D. Del. Jan. 11,
2019) (stating that "[b]ecause there is no right to
reinstatement, the plaintiffs arguably cannot show they suffered
an adverse employment action" in denying Title VII race

discrimination claim).  Further, to the extent that Plaintiffs

were able to demonstrate a *prima facie* case even without

requiring an interpretation of the CBA, Defendants have made

entirely clear that their defense to such a claim would be to

directly point to the CBA's provisions governing pension

contributions and argue that it does not provide for any such

contributions by Atlantic.  One way or another, to adjudicate

this claim the Court would need to not only reference the

parties' CBA, but to directly interpret its provisions and reach

a holding regarding their proper meaning and contractual import.

     And when the Court says that resolution of Plaintiffs'

claim would require interpretation of the CBA, it is not

speaking hypothetically.  There are specific provisions of the

CBA that govern potential pension contributions, which both

parties have directed the Court to: Article XI(a) affirmatively

requires that "[f]or each hour or portion of an hour for which

an employee receives pay, the Employer shall make a contribution

in the current allocation per Article V herein, to the Pension

and Annuity . . .," (ECF No. 33-1 at 19), and Article V provides

that "[t]he hourly fringe benefit contributions for a warehouse

person shall be as above in said charts," (id. at 16), although

the charts above which appear to be intended to provide the

rates of fringe benefit contributions to the Pension Fund are

blank.  Id. at 13-16.  The parties here, in the briefing for

50

these very motions, have directly debated whether these provisions of the CBA should be read to require or provide for pension contributions by Atlantic on Plaintiffs' behalf, and in the process of doing so have provided the Court with a clear window into the future contractual interpretation that would be needed to assess whether pension contributions were anticipated or required — and therefore whether Plaintiffs had suffered an adverse employment action or Defendants have a valid, nondiscriminatory explanation for their actions.

Therefore, despite the consistent precedent in this district holding that the LMRA does not preempt NJLAD claims, the Court is faced with the unavoidable conclusion that Plaintiffs' NJLAD discrimination claim based on the pension contribution issue would require this Court to substantially interpret the CBA in order to determine whether Plaintiffs were in fact entitled to receive pension contributions, or if Atlantic's actions were simply in line with the language of the CBA. Were it presented outside the specific context of the NJLAD, this appears to be the exact type of claim that the Third Circuit has previously held as preempted by the LMRA. Compare Antol, 100 F.3d at 1117 (finding pre-emption of plaintiff's Pennsylvania Wage Payment and Collection Law claims because the "suit [was] based 'squarely on the terms of the collective bargaining agreement') (citing Wheeler, 985 F.2d at 113) with

Voilas, 170 F.3d at 378 (finding no pre-emption because plaintiff's "claim in this case is not directly based upon the [CBA] ... nor will the resolution of the elements ... require the interpretation of those bargaining agreements").

This conclusion is only further strengthened by the fact that although courts in this district have repeatedly rejected LMRA preemption arguments related to the NJLAD, Plaintiffs' pension-focused discrimination claim here appears to resemble the types of claims nominally brought under state antidiscrimination laws which courts in other circuits have similarly found were preempted under the LMRA.  Much of the case law in this district finding otherwise traces directly back to a 1991 opinion which surveyed the national case law to that point and found that "courts have uniformly held that state anti-discrimination laws are not preempted by § 301 of the LMRA because the right not to be discriminated against 'is defined and enforced under state law without reference to the terms of any collective bargaining agreement,' even where the labor contract itself prohibits discrimination." Carrington v. RCA Global Communications, Inc., 762 F. Supp. 632, 641 (D.N.J. 1991).  However, as another court in this district more recently acknowledged, that trend no longer holds, as a number of courts across the country, faced with claims under other states' antidiscrimination laws, "have found preemption of state law

discrimination claims . . . in cases where the CBA specifically governed the litigated cases" and the claims required direct contractual interpretation of the respective CBA's terms and provisions.  Coefield, 532 F. Supp. 2d at 694.  See, e.g., Fant v. New England Power Serv. Co., 239 F.3d 8, 15 (1st Cir. 2001) (finding state law discrimination claim preempted where plaintiff's claim required interpretation of CBA seniority provisions because "questions relating to qualifications and seniority usually require recourse to details that are imbedded in CBAs"); Reece v. Houston Lighting & Power Co., 79 F.3d 485, 487 (5th Cir. 1996) (finding preemption of state discrimination claims when the plaintiff's discrimination claim actually "turned on questions of promotion, seniority, and assignment to training programs, all of which are provided for in the CBA," because the plaintiff would have to challenge the employer's rights under the CBA and therefore interpretation of the CBA was "made necessary by an employer defense"); Davis v. Johnson Controls, Inc., 21 F.3d 866 (8th Cir. 1994) (finding state disability discrimination claim preempted by the LMRA because "the relocation of [Plaintiff] to a position commensurate with his physical limitations would require an examination of the seniority rights of both [Plaintiff] and other employees under the collective bargaining agreement. [Plaintiff's] contention that the collective bargaining agreement allows for transfer

53

without alteration of seniority rights, even if ultimately held
to be correct, would perforce require interpretation of the
agreement. Accordingly, the district court correctly held that
[Plaintiff's] state-law claim depends upon the meaning
ultimately given to the collective bargaining agreement and thus
is preempted under the Lueck-Lingle [preemption] doctrine");
O'Brien v. Consolidated Rail Corp., 972 F.2d 1 (1st Cir. 1992)
(finding state discrimination claim was preempted by the LMRA
because seniority was among the litigated issues and was also
covered in the CBA, which contained explicit rules and
regulations governing an employee's fitness and ability to
perform safely the functions of a stevedore); Kroeger v. L3
Techs., Inc., No. 2:17-cv-08489-JFW-AGR, 2018 WL 1357363 (C.D.
Cal. Mar. 15, 2018) (holding that various state law statutory
discrimination and retaliation claims and a claim for
intentional infliction of emotional distress were preempted by §
301, because "Plaintiff explicitly predicates his claims ... on
a number of alleged violations of the CBA ... This alone is
sufficient for preemption ... Additionally, Plaintiff's claims
largely turn on alleged adverse actions and legal violations,
the propriety of which the CBAs govern and that are (or have
been) the subject of multiple contractual grievances by
Plaintiff"); Morrissey v. Verizon Communications Inc., No. 10
Civ. 6115(PGG), 2011 WL 2671742, at *5 (S.D.N.Y. July 7, 2011)

("Because a critical aspect of Plaintiff's age discrimination claims—as he chose to plead them—is his allegation that Verizon terminated his employment in violation of its contractual 'obligat[ion] to lay off technicians according to seniority' . . . 'resolution of [Plaintiff's] state-law claim depends on an interpretation of the collective-bargaining agreement.' As a result, his state law claims are pre-empted by Section 301 of the LMRA."); Taylor v. Am. Airlines, Inc., 738 F. Supp. 2d 940, 945 (E.D. Mo. 2010) ("Since the state law claims in this case challenge the seniority agreement, which is explicitly incorporated into American Airlines' CBA, a resolution of this dispute would require this Court to interpret the labor contract. Therefore, plaintiffs' claims are preempted...."); Richardson v. P & O Ports Balt., No. CCB-09-631, 2009 WL 2487080, at *3 n. 3 (D. Md. Aug. 12, 2009) ("[R]eference to the seniority provisions of the CBA and interpretation of their terms would be necessary.... Accordingly, the state law causes of action are preempted...."); Bachilla v. Pac. Bell Tel. Co., No. Civ. S-07-739 RRB KJM, 2007 WL 2825924, at *8 (E.D. Cal. Sept. 25, 2007) ("[T]o the extent that Plaintiffs' discrimination claim is premised on Pacific Bell's promotion of less senior male coworkers in violation of its seniority policy, it is preempted. This is because resolution of this claim is substantially dependent on an analysis of the terms of the CBA.

This claim cannot be evaluated without interpreting the seniority provisions of the CBA since the terms of Plaintiffs employment, including their eligibility for a promotion and/or transfer, are governed by the CBA.").

Ultimately, the Third Circuit has clearly stated that the "dispositive question [in pre-emption analysis] is whether [plaintiffs'] state claims require an interpretation of a provision of the CBA." Kline v. Sec. Guards, Inc., 386 F.3d 246, 256 (3d Cir. 2004).  And the Supreme Court has explained that the doctrine of federal preemption of state law claims in the labor law context is intended to refute "parties' efforts to renege on their [] promises by 'relabeling as tort-suits actions simply alleging breaches of duties assumed in collective-bargaining agreements." Livadas v. Bradshaw, 512 U.S. 107, 122-24 S.Ct. 2068, 129 L.Ed.2d 93 (1994).  While Plaintiffs' claims here are raised under state antidiscrimination law rather than as tort claims, Plaintiffs' pension contributions-based NJLAD claim is, at its core, simply a relabeling of the nearly identical LMRA claim they asserted earlier in the same Complaint, and directly references and disputes the proper interpretation of a CBA provision.  Ultimately, the true contention on the face of the Complaint is that Atlantic breached the CBA by failing to make pension contributions because of Plaintiffs' race, national origin, ethnicity, or

56

color.  This Court has no means for assessing such a claim that
would not involve a direct and extended interpretation of the
CBA as its very first analytical step; these claims are
"inextricably intertwined with considerations of the terms of
the labor contract," and the Court therefore finds that they are
preempted by the LMRA.  Carrington, 762 F. Supp. at 640 (quoting
Lueck, 471 U.S. at 212).

The Court does not view this holding as a refutation of
prior case law or as inconsistent with the findings of other
courts in this District.  Plaintiffs have put forward a
discrimination claim that is uniquely centered on their
interpretation of a disputed contractual provision, and it
should be noted that even those Courts which have asserted as a
basic principle that NJLAD claims are not preempted by the LMRA
have consistently gone forward to then analyze the specific
claims asserted in their case, rather than simply ending the
analysis with a blanket statement that LMRA preemption of an
NJLAD claim is impossible.  See, e.g., Coefield, 532 F. Supp. 2d
at 695 (providing background case law rejecting LMRA preemption
of NJLAD claims, but then proceeding to state that "[w]ith this
background, the Court now turns to each of Plaintiff's claims to
determine whether they require interpretation of the CBA");
Barone, 2019 WL 3297230 at *6 (stating that the Court agrees
with prior precedent rejecting LMRA preemption of NJLAD claims,

but then proceeding to analyze the factors and determinative issues for plaintiff's specific claims as alleged there); Naples, 102 F. Supp. 2d at 554 (same).

While parties are of course the masters of their own complaints, Plaintiffs here "virtually invited this preemption conclusion in [their] complaint, where [they] alleged that the [conduct] constituting the substance of [their]" claims was in violation of their CBA.  Fant, 239 F.3d at 16.  Plaintiffs here may not simply relabel an LMRA claim as an NJLAD claim in order to evade the preemption doctrines designed to address the exact types of claims they have raised here, and thereby evade the LMRA's shorter statute of limitations.  Since Plaintiffs' NJLAD claim based on Atlantic's failure to make pension contributions therefore must either be considered an LMRA claim or dismissed, the Court will dismiss it as time-barred for the same reasons that the identical claim asserted under the LMRA was dismissed.[5]

However, the Court finds that Plaintiffs' pension

---

[5] The Court notes here, however, that this holding only applies insofar as Plaintiffs intended to assert a claim that Atlantic had failed to make contributions to their pensions based on their status as members of protected classes.  To the extent that Plaintiffs intended to assert a claim that the fact that the one white warehouse employee was given a separate agreement providing for pension contributions, when none of the Plaintiffs were, was discriminatory, that claim would clearly not be preempted by the LMRA for the same reason the Court rejected LMRA preemption of any discrimination claim based on the Union's alleged negotiation of better CBAs for workforces that were predominantly white.

contribution claim under the NJLAD is the only remaining claim that is preempted by the LMRA in this manner.  The Court's review of the Complaint and the claims presented in it has not discovered any similarly unique or pressing concerns regarding the need to interpret the CBA for Plaintiffs' discrimination claims regarding wages, overtime pay, or other paycheck deductions, and Defendants have not put forth sufficiently persuasive arguments to convince the Court to further differ from the clear line of decisions in this District.

For example, although the CBA contains a provision governing overtime payments in Article VI, Defendants have failed to demonstrate why an interpretation of this provision would be central to adjudication of Plaintiffs' NJLAD claim. Plaintiffs' claim is that they were not properly paid for overtime work because of their race, ethnicity, national origin, or color, and neither party has raised any dispute regarding the meaning of the provision in question here.  It is certainly true that the provision for overtime pay found in Article VI may be "relevant to the determination of certain issues of fact, but there is no dispute about what it says, what it means, whether it is valid, or whether [Plaintiffs are] bound by it."  Bull v. United Parcel Service, Inc., No. 07-2291 (KM)(MCA), 2014 WL 2965696, at *14 (D.N.J. July 1, 2014).

The same is true to the extent that Plaintiffs intended to

put forth NJLAD claims related to their wages or the payment of back pay related to wage increases: while Article V of the CBA clearly governs the wages to be paid by Atlantic to its warehouse employees, neither party has put in dispute the interpretation of those specific provisions.  Instead, the only relevant issue in assessing such claims under the NJLAD is whether Atlantic engaged in the alleged conduct, and whether they engaged in it due to Plaintiffs' race, ethnicity, national origin, or color.  Again, no specific dispute has been raised by either party regarding what that provision says or means regarding Plaintiffs' wages.  While the CBA's provisions may be relevant to the analysis of Plaintiffs' claim under the NJLAD, the Court finds that, at least on the Complaint and briefs currently before it, no substantial interpretation of the CBA would be required to adjudicate those claims.

Finally, the Court reaches the same conclusion regarding Plaintiffs' NJLAD claim based on Defendants' act of allegedly imposing "a 3-5% deduction from Plaintiff's pay which has been described variously as constituting, and not constituting union dues . . . ."  (ECF No. 1-1 at 13, ¶ 6).  Defendants argue that this claim again puts into direct question the interpretation of labor contracts, namely the Union Constitution and Bylaws, which they assert contain provisions governing deductions for dues or other purposes.  The Court acknowledges that "for preemption

purposes, the term 'labor contract' includes union constitutions." Brock v. Union Local No. 830, 2008 WL 2945387, at *3 n. 4 (E.D. Pa. July 30, 2008) (quoting Wall v. Constr. & Gen. Laborers' Union, Local 230, 224 F.3d 168, 178 (2d Cir. 2000); see also Lewis v. Int'l Bhd. of Teamsters, 826 F.2d 1310, 1314 (3d Cir.1987) ("[A] federal court has jurisdiction under [LMRA] section 301(a) over suits brought by an individual union member against his or her local union or the international union for violation of a union constitution.").

However, the Court does not agree that Plaintiffs' NJLAD claim on this front necessarily would require a "substantial interpretation" of these labor contracts. Plaintiffs, in their Complaint, directly allege that Atlantic and the Union have provided them "varying and indefinite explanations as to what the 3% to 5% deduction from their paychecks is actually being used for," therefore calling into question the actual reason why Defendants made those deductions. The Court understands that Defendants intend to raise, in their defense, an argument that the Union Constitution and Bylaws provide for these deductions.

While this defense brings this claim closer to Plaintiffs' preempted NJLAD pension-focused claim, there is a key difference here. For their pension NJLAD claim, Plaintiffs themselves directly put into contention the proper interpretation of the CBA's provisions governing pension contributions; for their

NJLAD claim focused on paycheck deductions, Plaintiffs'
Complaint, on its face, does not specifically dispute whether
certain provisions of the Union Constitution or Bylaws might
provide for deductions, but essentially alleges that Defendants'
shifting explanations for the deductions are false and that the
true explanation is discrimination based on race, ethnicity,
national origin, and color.

Such a claim may be difficult to successfully plead or to
prove, and the Court does not disagree with Defendants that
provisions of the Union Constitution and Bylaws might be
relevant to consider and reference in any such analysis.  But
although this claim presents a closer call, the Court ultimately
errs on the side of not finding preemption and defers to the
strong precedent in this District finding that most NJLAD claims
are not preempted by the LMRA.  Plaintiffs' NJLAD claim based on
the paycheck deductions described above is closer to those
claims that previous courts in this District have found do not
require a "substantial interpretation" of a labor contract, and
therefore are not preempted by the LMRA.

For these reasons, the Court finds that only Plaintiffs'
pension contribution-based NJLAD claim is preempted by the LMRA
and must be dismissed as time-barred.  The remainder of
Plaintiffs' NJLAD claims are sufficiently separate and distinct
to survive Defendants' LMRA preemption arguments.  Put most

simply, Plaintiffs, through their own drafting decisions, created a unique situation in which that specific NJLAD claim was entirely dependent on this Court's interpretation of the CBA; none of their other claims go quite so far, or similarly provide the Court with no other option for assessing their merit.  Accordingly, Plaintiffs' NJLAD claim for Atlantic's failure to make pension contributions will be dismissed, and the remaining NJLAD claims survive.

   C. The Court Declines to Exercise Supplemental Jurisdiction
      Over Plaintiffs' Remaining State Law Claims

   Having ruled on Plaintiffs' LMRA preemption arguments, the Court will remand Plaintiffs' remaining state law claims back to state court.  The Court does recognize that the Union has put forward two additional arguments for federal labor law preemption of Plaintiffs' NJLAD claims, beyond the LMRA argument assessed above: specifically, it asserts that Plaintiffs' NJLAD claims are also preempted by the National Labor Relations Act ("NLRA") and the Labor-Management Reporting and Disclosure Act ("LMRDA").  These arguments potentially matter here because, as the Court previously mentioned, "[o]nce an area of state law has been completely pre-empted, any claim purportedly based on that pre-empted state law is considered, from its inception, a federal claim, and therefore arises under federal law." Caterpillar, Inc. v. Williams, 482 U.S. 386, 393 (1987).

However, even were Defendants to assert that their NLRA or LMRDA preemption arguments would grant this Court subject-matter jurisdiction over Plaintiffs' remaining NJLAD claims, such arguments would fail.  The law is clear that the NLRA "does not completely preempt state law and thus provide[s] no basis for removal jurisdiction." Boone v. Local Union 475 Pipefitters/Steamfitters, No. CV 16-5482 (JLL), 2016 WL 7325472, at *2 (D.N.J. Dec. 16, 2016) (quoting Briones v. Bon Secours Health Sys., 69 F. App'x. 530, 534-35 (3d Cir. 2003)).  Similarly, "the LMRDA presents a preemptive federal defense to state law causes of action, which is not sufficient to sustain" subject-matter jurisdiction over a state law claim.  Gerow v. Kleinerman, No. 01-cv-138 (WGB), 2002 WL 1625417, at *4 (D.N.J. July 2, 2002) (citing Box Tree South; Esser; Dzwonar; Morris v. Scardelletti, No. 94-3557, 1995 WL 120224 (E.D. Pa. Mar. 14, 1995)).  Although Defendants may invoke preemption under the NLRA or LMRDA as a defense in state court, such preemption "is not the type of complete preemption that would provide Defendants with a basis for federal question jurisdiction." Kline v. Sec. Guards, Inc., 386 F.3d 246, 262-63 (3d Cir. 2004).

Therefore, with Plaintiffs' federal LMRA claims having been dismissed — along with their state law claims against Atlantic for unjust enrichment and violation of the NJLAD due to failure to make pension contributions — the Court is left with only

64

state common law and statutory claims remaining before it.  The
removal of this case from state court, and this Court's
jurisdiction over the action, were predicated on the presence of
the federal cause of action under the LMRA, pursuant to which
the Court had the ability to exercise supplemental jurisdiction
over any related state law claims.  It does not appear that the
Court would have had original jurisdiction over Plaintiffs'
state law claims independent of the LMRA cause of action
originally asserted in the Complaint.[6]

"[W]hen all federal claims against a party have been
eliminated from a case, the district court may, in its
discretion, decline to extend supplemental jurisdiction over the
remaining state law claims." Rothman v. City of Northfield, 716
F. Supp. 2d 369, 373 (D.N.J. 2010) (citing Lentz v. Mason, 961
F. Supp 709, 717 (D.N.J. 1997)).  Where the federal claims are
dismissed at an early stage in litigation, courts generally
decline to exercise supplemental jurisdiction over state law
claims.  See United Mine Workers v. Gibbs, 383 U.S. 715, 726
(1966); Growth Horizons, Inc. v. Delaware Cty., Pa., 983 F.2d
1277, 1284-1285 (3d Cir. 1993).

---

[6] Neither party has asserted that this Court would have diversity
jurisdiction over the state law claims under 28 U.S.C. § 1332,
and since Plaintiffs' Complaint pleads that each of the
Plaintiffs live in New Jersey and Atlantic is a New Jersey
corporation, it appears highly unlikely that diversity
jurisdiction would exist here.

Here, the Court is dismissing the only federal claims asserted in the Complaint and doing so at a comparatively early stage in this litigation.  Accordingly, the Court will decline to exercise supplemental jurisdiction over Plaintiffs' remaining state law claims pursuant to 28 U.S.C. § 1367(c)(3).  As the Pension Fund's motion to dismiss is targeted entirely on one of Plaintiffs' state common law causes of action, it will be denied as moot.

In cases where the claims were initially filed in state court and then properly removed here, like this present case, the Court has additional discretion to remand the remaining state law claims rather than simply dismissing them.  See 28 U.S.C. § 1447(c) ("If at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded.").  Accordingly, the Court will exercise its discretion and remand Plaintiffs' remaining state law claims back to state court.

D. Motion to Seal

Finally, Plaintiffs have moved to seal four pages of documents that were initially filed as Exhibit A[2] to their complaint in state court and re-filed on the docket for this action at pages 19-22 of ECF No. 1-1 when Defendants' removed this action to this Court.  Local Civil Rule 5.3 governs requests to seal documents filed with the Court.  To succeed on

66

a motion to seal, the moving party must describe: (1) the nature of the materials at issue; (2) the legitimate private or public interests that warrant the relief sought; (3) the clearly defined and serious injury that would result if the relief sought is not granted; and (4) why a less restrictive alternative to the relief sought is not available.  L. Civ. R. 5.3(c)(3).  While it is within the Court's authority to restrict public access to information, it is well-settled that there is a "common law public right of access to judicial proceedings and records."  In re Cendant Corp., 260 F.3d 183, 192 (3d Cir. 2001).

The moving party bears the burden to overcome this presumption of public access and must demonstrate that "good cause" exists for the protection of the material at issue. Pansy v. Borough of Stroudsburg, 23 F.3d 772, 786 (3d Cir. 1994).  Good cause exists only when the moving party makes a particularized showing that disclosure will cause a "clearly defined and serious injury."  Id.  Good cause is not established where a party merely provides "broad allegations of harm, unsubstantiated by specific examples or articulated reasoning." Id. (quoting Cipollone v. Liggett Group, Inc., 785 F.2d 1108, 1121 (3d Cir. 1986)).

The Court has little difficulty in finding that Plaintiffs have met their burden in demonstrating that good cause exists

for sealing the document in question.  In support of their
motion, Plaintiffs have filed a certification from their
counsel, Timothy C. Alexander.  (ECF No. 33-1).  In his
certification, Mr. Alexander explains that the documents he
seeks to seal are in fact entirely unrelated to this action; due
to an apparent "clerical error" in his office, the original
complaint filed in state court attached as an exhibit four pages
from a settlement agreement pertaining to a separate matter,
rather than the Collective Bargaining Agreement he intended to
file as Exhibit A[2].  Id. at ¶¶ 3-10.  The pages from the
accidentally filed settlement agreement contain a "File
No./Escrow No." showing more than four digits.

Plaintiffs have sufficiently set forth the elements
required by Local Civil Rule 5.3.  The pages sought to be sealed
are from a settlement agreement that is unrelated to this
present action.  There is clearly no public interest at stake
here, as the documents are a private settlement agreement
involving unrelated parties; similarly, the parties to that
private settlement agreement have a clear interest in
maintaining their privacy, which they have taken no action to
undermine here as they did not file the documents themselves and
are not involved in this lawsuit.

Finally, the Court agrees that there is clearly no less
restrictive alternative here, as the documents themselves are

68

pages from an unrelated settlement agreement, and leaving them unsealed on the docket or only redacted would expose a private agreement between unrelated parties to the general public through no fault or actions of their own, with no corresponding benefit to the public.

Importantly, as Plaintiffs' counsel notes, the pages he seeks to have sealed include an escrow number and financial information for the unrelated parties and their apparent settlement agreement.  The Court understands that harm may come to these parties by the inadvertent disclosure of their agreement and financial information, which they did not cause and which appears to have only happened due to a mistake by counsel's office in an entirely separate action.  Good cause therefore exists to seal these pages of Plaintiffs' exhibit, and the Court will grant Plaintiffs' motion.  The documents found at ECF No. 1-1 will remain sealed, and as Plaintiffs have since filed the correct version of the CBA exhibit as part of their certification for this motion, they will simply be directed to file on this docket a certification from counsel reattaching the Complaint in this action as an exhibit, which was the only other document originally filed at ECF No. 1-1.

## **CONCLUSION**

For the reasons expressed above, Defendants Atlantic and the Union's motions to dismiss (ECF No. 9 and 12) will be

granted as to Plaintiffs' LMRA claims, unjust enrichment claim, and the single preempted NJLAD claim, and Defendant Pension Fund's motion to dismiss will be denied as moot.  Plaintiffs' motion to seal (ECF No. 32) will be granted, and Plaintiffs' will be directed to file a certification from their counsel reattaching the Complaint for this action.  Finally, Plaintiffs' remaining state law claims will be remanded to state court.

An appropriate Order will be entered.


Date:  July 26, 2021                /s Noel L. Hillman
At Camden, New Jersey        NOEL L. HILLMAN, U.S.D.J.